## In re PITTSBURGH RYS. CO.

No. 20225.

District Court, W. D. Pennsylvania.

April 30, 1945.

Anne X. Alpern, City Sol., and Leon Wald, Asst. City Sol., both of Pittsburgh, Pa., for petitioner, City of Pittsburgh.

John J. O'Connell, Co. Sol., and Frank Butler, Asst. Co. Sol., both of Pittsburgh, Pa., for Allegheny County.

Marland Gale and Samuel M. Koenigsberg, both of New York City, for Securities and Exchange Commission.

Charles B. Prichard, of Pittsburgh, Pa., and Maurice J. Dix, of New York City, for Jules Guggenheim and other public security holders.

J. E. Madva and Roy G. Bostwick, both of Pittsburgh, Pa., for certain creditors.

Moorhead & Knox and Wm. S. Moorhead, all of Pittsburgh, Pa., for Monongahela St. Rys. Co. and Pittsburgh & Birmingham Traction Co., guaranteed underliers.

Richard W. Ahlers, of Pittsburgh, Pa., for Suburban Rapid Transit St. Ry. Co., guaranteed underlier.

Emanuel Amdur, Lewis M. Alpern, and A. E. Kountz, all of Pittsburgh, Pa., for Tort Creditors Committee.

C. Elmer Bown, Thomas J. Munsch, and Philip A. Fleger, all of Pittsburgh, Pa., for Philadelphia Co.

Blaxter, O'Neill & Houston, J. Henry O'Niell, and J. Garfield Houston, all of Pittsburgh, Pa., for trustees of Pittsburgh Rys. Co., debtor.

H. F. Stambaugh, of Pittsburgh, Pa., for Committee for Bondholders of Southern Traction Co.

Watson B. Adair, of Pittsburgh, Pa., special master.

McVICAR, District Judge.

In the matter of the reorganization of the Pittsburgh Railways Company, debtor, the City of Pittsburgh filed a petition October 23, 1942, acting in the public interest and as a large creditor. The general purpose of the petition was to facilitate reorganization. The prayers for relief are set forth in six paragraphs numbered 1 to 6, inclusive. Only numbers 1 and 2 were pressed; consequently, consideration has been limited to these two prayers. The Tort Creditors Committee joined in the petition of the City. A number of motions were made to dismiss the petition and, also, a number of answers were filed. These are set forth in paragraphs I and II of the Special Master's Report, to whom the petitions and pleadings, aforesaid, were referred for the purpose of having his findings of fact and conclusions of law. The Special Master held a large number of hearings, extending over a considerable period of time. He took much evidence; he made a report of his findings and conclusions, together with his recommendation, which contains 229 printed pages. The Special Master exercised much care and study of the matter referred to him. A hearing was held by this Court on the Master's Report and the objections and exceptions thereto, March 28, 1945. The parties in interest were fully heard. Objections and exceptions to the Master's Report were made by the City of Pittsburgh, the Securities and Exchange Commission (which orally joined in the City's objections), the County of Allegheny, the Philadelphia Company, Jules Guggenheim, et al., and a committee for the bondholders of the Southern Traction Company.

The facts are fully set forth in the Special Master's Report. A brief statement of some of the material facts is set forth herein.

The petition of the Pittsburgh Railways Company for reorganization was filed May 10, 1938. This company operated a system of street railways having a mileage of over 500 miles. It was operated as a transporta-

tion unit for the benefit of those using street railways since 1902. The preservation of this transportation unit appears to be a public necessity in order that adequate transportation, at reasonable rates, be furnished to the public in the City of Pittsburgh and in surrounding areas. The system should be reorganized as a unit if it can be legally done. The Trustees appointed by this Court have filed a plan for such a reorganization, which is now pending in this court. It has been approved by the Pennsylvania Public Utility Commission. Objection to the organization of this transportation as a unit is limited to 9 guaranteed companies and the guarantor, the Philadelphia Company. It is regretted that these parties have been unable to remove their objections and it is hoped that they will be able to do so in the near future.

All of the stock of the Pittsburgh Railways Company is owned by the Philadelphia Company. Forty-nine underliers of the Pittsburgh Railways Company are in this proceeding; 36 of them are underliers of the Philadelphia Company. Four of the unguaranteed underliers are not owned either by the Pittsburgh Railways Company or the Philadelphia Company. These companies have made leases for their properties to other underliers for a period of 900 years. Nine underliers holding guaranties from the Philadelphia Company for payment of lease rent, taxes, etc. are not owned by the Pittsburgh Railways Company or the Philadelphia Company. These guaranteed underliers have leases to other underliers for a period of 900 years or more. The Pittsburgh Railways Company operated the system, aforesaid, under leases and operating agreements. Less than 8% of the trackage in the system was owned by the Pittsburgh Railways Company.

The 49 underliers of the Pittsburgh Railways Company can be divided into three groups: (1) Group in which the Pittsburgh Railways Company has some stock ownership and in which there are operating leases or agreements; (2) group in which the Pittsburgh Railways Company owns nearly all the stock and is known as the "United Traction Group", and is operated by the Pittsburgh Railways Company under an agreement; and (3) group in which nearly all the stock is owned by the Philadelphia Company and is operated by the Pittsburgh Railways Company under agreement.

The Philadelphia Company, by reason of its stock control and ownership in 36 underliers of the Pittsburgh Railways Company, has common directors and officers in said companies and is in a position to control, and does control, said underliers. No fraud or unfairness has been shown in said control.

The leases to Pittsburgh Railways Company by the underliers, and between the various underliers, are bona fide leases which created the relation of lessor and lessee, and this relationship continues to the present time. Also, the operating agreements to Pittsburgh Railways Company are bona fide and continue to the present time.

The underliers, since leasing their properties to the debtor in 1902, have elected directors and officers and made tax returns. The principal function of these companies has been to receive and distribute rent from their properties.

The financial condition of the Pittsburgh Railways Company has been unsatisfactory since 1902. It has been in receivership proceedings in this court. It has received help from the Philadelphia Company several times. The unguaranteed underliers and all but 6 of the Philadelphia underliers are unable to meet their debts as they mature. It is evident from the past and existing conditions, that the capital in this system should be reduced in value, so that the owner or owners thereof will be solvent and so that a fair return may be made on the amount invested.

The Pittsburgh Railways Company, together with its subsidiary, the Pittsburgh Motor Coach Company, have filed petitions for reorganization. The original property leased to the Pittsburgh Railways Company in 1902 has nearly all disappeared; substitutions have been made; some abandonments have occurred. At the oral argument no one was able to state what probably would result if this transportation system was not organized as a unit; or if the leases and operating agreements of the Pittsburgh Railways Company were disaffirmed, whether new leases and operating agreements could be made on a reasonable financial basis.

The question that arises under paragraph (1) in the prayer of the petition of the City of Pittsburgh is, whether this Court, forthwith, should assume and exercise jurisdiction over all the properties and assets, or interests therein, of each of the underliers, or so much thereof, as may be actually or constructively in the custody of this court;

and whether it should determine the rights of all creditors and stockholders of the underliers, as is set forth in said prayer; or in other words, has this court power to exercise jurisdiction over the property of the underliers in this reorganization proceeding?

■■■ The jurisdiction of this court is limited to that conferred on it by the Federal Constitution and statutes. The rule is stated by Dobie on Federal Procedure, Sec. 16, page 25:

"Every federal court is a court of limited, not of general, jurisdiction. All presumptions are against the jurisdiction of such a court, so that the facts disclosing the jurisdiction must affirmatively appear upon the record. Jurisdiction cannot be conferred by the mere consent of the parties to the suit, and the question of jurisdiction, whether or not raised by the parties, is always, during the progress of the case, before the federal courts, both trial and appellate."

Section 111 of the Chandler Act, 11 U.S. C.A. § 511, provides:

"Where not inconsistent with the provisions of this chapter, the court in which a petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and its property, wherever located."

Section 115 of said Act, 11 U.S.C.A. § 515, provides:

"Upon the approval of a petition, the court shall have and may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it, exercise all the powers, not inconsistent with the provisions of this chapter, which a court of the United States would have if it had appointed a receiver in equity of the property of the debtor on the ground of insolvency or inability to meet its debts as they mature."

Section 216(2), 11 U.S.C.A. § 616(2) relating to the provisions of the plan, provides:

"A plan of reorganization under this chapter— * * *

"(2) may deal with all or any part of the property of the debtor."

Each of these sections limits the jurisdiction of the court to property of the debtor.

Section 126, 11 U.S.C.A. § 526, provides the procedure for corporations or creditors who desire to proceed for reorganization under this Act.

The Trustees in this reorganization proceeding filed a petition in this court March 13, 1939, requesting instructions as to payment of Social Security taxes, Corporate Stock taxes, Corporate Net Income taxes, Corporate Loan taxes due from the underliers to the Commonwealth of Pennsylvania, and also, United States Income and Social Security taxes. Objection to the payment of these taxes was made by the Tort Creditors Committee and by the City of Pittsburgh; the underlying companies and the Philadelphia Company were in favor of the payment thereof. This Court directed the payment of such taxes as had accrued since the reorganization proceedings were begun as an operating or administration expense. An appeal from this Court's decision was taken by the Tort Creditors Committee and the City of Pittsburgh to the Circuit Court of Appeals of this circuit. In re Reorganization of Pittsburgh Rys. Co., 111 F.2d 932, 933. Philadelphia Company et al. appeared as appellees. Appellees argued:

"that since the properties of the underlying companies are in the possession of the trustees of the debtor and are being used and operated by them with properties of the debtor as a unified system the taxes of the underlying companies are, in effect, taxes of the unified system and are, therefore, operating and administrative expenses of the trustees. * * *

"We are asked to ignore the legal relationships existing between the Philadelphia Company, the debtor and the underliers and their separate corporate identities and treat them all as one unified transportation system. For all practical purposes, the appellees argue, the separate identity of the underlying corporations has been lost."

The Circuit Court of Appeals, in its opinion by Maris, C. J., stated, inter alia, that the taxes listed did not bear any relation to the properties leased by the underliers to the debtor; that "The sole obligation of the debtor with respect to these taxes arose under the leases and operating agreements with the underliers which provided that the debtor should pay all taxes assessed against the underliers. The obligation of the debtor to pay the taxes was an additional consideration for its use of the underliers' property, and, therefore, as to it a rental obligation rather than a tax liability." The Court further stated, "that the only corporations in the system which are in process of reorganization are the debtor and its subsidiary. The Trustees are not trustees

for the Philadelphia Company nor for any of the underliers. Neither the past history of the system nor the present state of the reorganization proceedings would, we think, justify our ignoring the existence of the separate legal entities which compose that system." The Court further stated, "During the interim their sole obligation is to pay the lessors a reasonable amount for the use and occupation of the properties actually in use." The Court further stated, "We, however, are dealing with a contractual liability of the debtor." The judgment of this Court was reversed on the ground that "the order of the district court cannot be sustained upon the record before us."

On writs of certiorari by Philadelphia Company et al. (Philadelphia Co. v. Dipple, 311 U.S. 628, 61 S.Ct. 33, 85 L.Ed. 399), the case was removed to the Supreme Court of the United States. The judgment of the Circuit Court of Appeals was affirmed. 312 U.S. 168, 656, 61 S.Ct. 538, 539, 85 L.Ed. 651. The opinion was written by Mr. Justice Roberts. In the opinion it is stated that:

"the question presented is whether the trustees should be directed to pay taxes owed by corporations whose properties the debtor operated under leases and operating agreements and the trustees continued to operate."

The Court further stated:

"The Court, June 14, 1938, appointed trustees with authority to maintain, manage, and operate the property in possession of, or owned by, the debtor; to manage and conduct its business; collect the revenues therefrom, and to pay all taxes and assessments due, or to become due, upon property in possession of, or owned by, the debtor. The trustees have since been operating the business, using therein the properties of the underlying companies. They have not affirmed or disaffirmed the leases and operating agreements."

The Court further stated:

"In view of the fact that none of the underlying companies had filed petitions for reorganization, and thus subjected themselves to the jurisdiction of the court, the Circuit Court of Appeals held that, until affirmation of the leases and operating agreements by the trustees, their sole obligation was to pay a reasonable amount for use and occupation which could not be in excess of the net earnings derived from the operation of each property and could not be

ascertained until it was determined what property was being used, the extent of the use, and the net earnings derived from it or its value."

In referring to the difference between the present case and that of another one referred to in the opinion, the Court said:

"Another difference is that, in the present instance, none of the lessors or underlying companies is in reorganization."

The Court further stated:

"If, in the opinion of the officers of the underlying companies, a reasonable time has expired those companies are not without redress. They may declare a forfeiture of the leases and abrogate the agreements for nonperformance on the part of the trustees or, they may apply to the District Court to compel an election by the trustees, to affirm or disaffirm. In the meantime, if the situation were such as to permit a proper calculation of the amount due for use and occupation, it would be proper for the court to order the trustees to pay a reasonable sum to be treated as a payment for use and occupation in the event that the leases and agreements are disaffirmed or, on account of rent, in the event they are affirmed."

The Court further stated:

"the trustees are not operating the business of the various underlying companies. It may well be that the only business those companies have is to collect or enforce payment of the rentals and considerations due them under the respective leases and operating agreements. But, even so, that business is not the business of the Pittsburgh Railways Company and the trustees are not trustees of any such business."

The Court further stated:

"The underlying companies' relation to the Pittsburgh Railways Company is that of creditor and debtor and no principle of equity justifies ignoring that relation when, so to do, might adversely affect the claims of other creditors.

"For these reasons we hold the judgment of the Circuit Court of Appeals was right and should be affirmed."

In Price v. Gurney, 65 S.Ct. 513, 514, the opinion of the Supreme Court, written by Mr. Justice Douglas, February 5, 1945, stated:

"Respondent as owner of 7 shares of stock and as agent for owners of some 675 shares (including certain shares deposited under the voting trust) also filed a petition

in the name of the Western Tool & Manufacturing Co. in the District Court asking that the company be given relief under Chapter X of the Bankruptcy Act [11 U.S.C.A. § 501 et seq.]"

The District Court dismissed the petition. The Circuit Court of Appeals reversed the District Court's decision, one judge dissenting. In re Western Tool Mfg. Co., 6 Cir., 142 F.2d 404. The question before the Court. was whether stockholders have the right to file petitions under Chapter X; also, whether the bankruptcy court, as an incident of its bankruptcy powers, can give relief which could be obtained in another forum. The judgment of the Circuit Court of Appeals was reversed, the Court saying:

"Respondents may have a· meritorious case for relief. On that we intimate no opinion. But if they are to be allowed to put their corporation into bankruptcy, they must present credentials to the bankruptcy court showing their authority.

"It is argued that circuity of action will be avoided and the adequacy of stockholders' remedies will be enhanced if the bankruptcy court is authorized to entertain petitions like the present one. That may well be true. But any such enlargement of the jurisdiction of the bankruptcy courts is for Congress. It has chosen to withhold from stockholders the right to institute these bankruptcy proceedings. In absence of federal incorporation, intracorporate disputes of the character presented here are, as we have said, governed by state law. The creation of a new basis of federal jurisdiction to hear them, pass on their merits, and adjudicate them is a legislative act."

In the case of Chicago, Milwaukee, St. Paul & Pacific Railroad Company Reorganization, Feb. 12, 1940, 239 I.C.C. 485, the facts are somewhat analogous to the facts in the present case. The Commission, in its opinion, stated:

"The consolidation of the properties of the Terre Haute with those of the debtor would be consistent with the plan announced in Consolidation of Railroads, 159 I.C.C. 522, and from the point of view of corporate simplicity would be desirable. However, as pointed out by the group of owners of certain Terre Haute first and refunding mortgage bonds who were permitted to intervene specially, the Terre Haute is not a debtor in any section 77 proceeding now before us. Although the Terre Haute bondholders were recognized as creditors of the debtor by the court's order of July 6, 1935, which divided them into four classes, this group did not appear during the hearings. The trustees under the Terre Haute mortgages have filed claims against the debtor. But the Terre Haute bondholders' group argues that we do not have jurisdiction to approve any plan which would disturb the lien of the mortgage securing the bonds owned by the group, and that any plan so providing would not be binding upon them, citing Greenbaum v. Lehrenkrauss Corp., 2 Cir., 73 F.2d 285, in which it was held error under the intercorporate relationships there found to exist, to enjoin proceedings against a subsidiary of a corporation in receivership. To the same general effect is In re Adolf Gobel, Inc., 2 Cir., 80 F.2d 849, also cited, except that the parent company was the debtor in a proceeding under the former section 77B of the Bankruptcy Act [11 U.S.C.A. § 207]. This group also raises similar jurisdictional questions as to our authority to approve a plan which would merge or consolidate the Terre Haute with the debtor or which would disaffirm the lease of the Terre Haute to the debtor. * * *

"This committee, in support of that part of its plan which provides that the Terre Haute bondholders be given securities of the reorganized company in lieu of their present bonds, argues that in view of the ownership by the debtor of 97 percent of the Terre Haute's capital stock, the existence of the 999-year lease under which the debtor has operated the Terre Haute's properties as part of the system, the assumption of the Terre Haute's bonded indebtedness and the guaranty of its income-mortgage bonds, the identity of many of the officers of the respective corporations, and other factors, the debtor's position is essentially that of owner of the Terre Taute, and the position of the Terre Haute is that of an instrumentality of the debtor, with the consequence that the assets of the Terre Haute are part of the assets of the debtor for purposes of reorganization. In support of its position the committee cites Central Republic Bank & Trust Co. v. Caldwell, 8 Cir., 58 F.2d 721; In re McCrory Stores Corp., 2 Cir., 69 F.2d 517; Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, certiorari denied 296 U.S. 614 [56 S.Ct. 134, 80 L.Ed. 435]; and In re Hotel Gibson Co., D.C., 11 F.Supp. 30.

"We have carefully examined these cases and are not persuaded that any of them is

606

of controlling or persuasive importance in the situation here presented. We agree with the group of Terre Haute bondholders that they are not such creditors of the debtor as would be bound as a class by a confirmed plan of reorganization which divested them of their existing liens upon the Terre Haute properties.

"The immediate accomplishment of a consolidation of these properties and the elimination of unnecessary corporate structures and intercompany arrangements, very appropriate at this time, is thus thwarted. However, the reorganization of the debtor on a sound basis must not be prevented on that account. Nor must the capital structure of the new company be too heavily weighted by Terre Haute obligations. * * *

"Under the circumstances, we shall approve, as part of the plan, provisions for dealing with the Terre Haute bonds in a manner which bears a fair and equitable relationship to the treatment accorded the bondholders of the debtor, does not require a consolidation of the properties, and yet accords to the Terre Haute bondholders the same security under the existing mortgage, respectively, as their present bonds hold. However, these provisions, in order to become an effective part of the plan, will have to be accepted by substantially all of the Terre Haute bondholders."

The decision of the Interstate Commerce Commission seems to have been acquiesced in by the parties, as it was not raised in the appeal to the Supreme Court. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 1943, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959.

■ Under the reorganization statute and the above decisions, the jurisdiction of this court is limited to the property of the debtor and does not extend to the property of the underliers. As the underliers have not filed petitions, their properties are not within the jurisdiction of this court, and this court has not the power in this proceeding to determine the substantive rights of the creditors and stockholders of the underliers.

■ The Master has made full findings of fact. He has also stated fully his conclusions of law. He has discussed the reasons and authorities in support of his findings. He considered that the property of the debtor and of the underliers have been operated as one system since 1902; that dominion over the property of the debtor and underliers has been exercised as if it were one system; that the officers and directors of 36 of the 49 underliers are officers and directors of the Philadelphia Company. He has considered the leases to underliers for 900 years or more; the changes that have been made in the property leased since 1902; the stock of the underliers that has been pledged; that the ownership of the 4 unguaranteed underliers and of the 9 guaranteed underliers is not in the Pittsburgh Railways Company or in the Philadelphia Company. He has considered their attitude toward reorganization and other material facts. He has found that this court has power to determine the title of the Pittsburgh Railways Company and the underliers in the properties leased and held under agreement. He has found that there was not such a confusion of property that corporate entities should be disregarded; that the manner in which the stock was owned and that the debtor, the Philadelphia Company, and some of the underliers had common officers and directors, did not create an agency; that mere convenience is not sufficient to confer jurisdiction; that the dominion the Pittsburgh Railways Company and the Philadelphia Company exercised over the properties of the underliers is not inconsistent with ownership of the underliers, with the result, that he has found that the title to the property of the underliers is not in the Pittsburgh Railways Company for the purpose of reorganization in this case. The facts and the law are so fully discussed in the Master's Report that further discussion is unnecessary on the part of this Court. We agree with the Master's conclusion that this court cannot take jurisdiction over the property of the underliers, and therefore that the petition of the City of Pittsburgh should be dismissed.