In the Matter of the MIDTOWN SKATING CORPORATION, Debtor.

Bankruptcy No. 79-B-967.

United States Bankruptcy Court, S. D. New York.

March 11, 1980.

Wachtell, Lipton, Rosen & Katz, New York City, for John Hancock Mut. Life Ins. Co.; by Theodore Gewertz and Marc Rosenbaum, New York City, of counsel.

Krause, Hirsch & Gross, New York City, for the debtor; by Arthur N. Ohringer, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

The Midtown Skating Corporation (the debtor) came to this court on May 30, 1979 when it filed a petition for the relief given by Chapter XI of the now repealed provisions of Chapter XI of the 1898 Bankruptcy Act, still applicable in this case, however.[1] Sections 301 et seq., 11 U.S.C. (1976 ed.) §§ 701 et seq.

At that time, the debtor was a tenant of John Hancock Mutual Life Insurance Company (Hancock), owner and landlord of

1. Despite its repeal on October 1, 1979 by Section 401(a) of Title IV of the 1978 bankruptcy reform legislation, the 1898 Act remains operative as to all petitions filed before October 1, 1979 when the former took effect. See Section 402(a) for the effective date of the 1978 law and Section 403(a), both of Title IV, for the grant of continued vitality to the 1898 Act.

premises in New York City on which the debtor operated a skating rink. The Chapter XI filing, among other things, stayed Hancock from proceeding in a New York City court to dispossess the debtor for non-payment of the rent called for by the lease between the parties.

Subsequent to the filing, Hancock made a motion to compel the debtor to pay for its use and occupation during the unfolding of the Chapter XI the full rent stipulated in the lease, over $28,000 per month, rather than the $8,000 per month the debtor was paying, apparently under the unilateral belief that the lesser figure represented the true value of the lease, a position not without support in the cases.[2] During the pendency of that dispute the debtor has been directed to pay $24,000 per month for its use and occupancy to abide this court's judgment.[3]

Whether the intent of this motion was to force the debtor to assume its lease and thereby impliedly reaffirm and accept the rent fixed there *de novo* or to allow Hancock to resolve its own "equivocal position" while the debtor neither assumes nor affirmatively rejects the lease, *In re Greenpoint Metallic Bed Co.*, 113 F.2d 881, 883–4 (2d Cir. 1940), apparently the "course charted by Congress" in the scheme of Chapter XI, *In re Michigan Express, Inc.*, 339 F.Supp. 226, 270 (W.D.Mich.1972), Hancock decided to take action. It filed this motion,[4] under what it took to be the authority of Rule 11–53, 415 U.S. 1036, 94 S.Ct. 3257, 39 L.Ed.2d li, augmented by "pertinent case law and the [court's] inherent powers" to compel the debtor to either assume or reject the outstanding lease within "a time certain". Hancock claims to be entitled to the relief it seeks because it should be permitted greater certainty as to its ability to re-let the space. The debtor's opposition, simply stated, is that the lease is a valuable asset necessary to its rehabilitation and, moreover, that only resolution of the pending dispute as to the real rental value will determine the likelihood of affirmance of the lease during the Chapter XI process.

▪ Contrary to the debtor's view that Hancock's motion "relies on § 70b of the Bankruptcy Act . . . ." (p. 5 of the debtor's memorandum of law in opposition), that section, 11 U.S.C. (1976 ed.) § 110b, is not applicable, and is not, in fact, the basis of the motion. To be sure, Section 70b did provide that an unexpired lease which a bankruptcy trustee had not assumed or rejected within the prescribed period was "deemed to be rejected". But the syllogism that the section applies in a Chapter XI case because a debtor in possession "exercise[s] all the powers of a trustee", Section 342, 11 U.S.C. (1976 ed.) § 742, finds support neither in the cases nor in the words Congress wrote relevant to executory contracts in a Chapter XI case.

As to the cases, see *e. g., American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A., supra,* at 126. See also 6 *Collier on Bankruptcy,* ¶ 3.23[5] (14th ed. 1978). As to Congress' thoughts in the matter, Section 313(1), 11 U.S.C. (1976 ed.) § 713(1), is as follows:

"Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it—(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate . . . ."

---

**2.** See *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.,* 280 F.2d 119 (2d Cir. 1960).

**3.** The parties have not yet brought that dispute to the place where it should be for the exercise of the court's decisional function.

**4.** This is a "contested matter" under Rule 914, 411 U.S. 1098, 93 S.Ct. 3170, 37 L.Ed.2d lxxviii; applicable in Chapter XI cases by Rule 11–63, 415 U.S. 1039, 94 S.Ct. 3259, 39 L.Ed.2d lii, for the relief sought is not of the kinds contemplated by Part VII of the Rules, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi *et seq.*, also applicable in Chapter XI cases by Rule 11–61, 415 U.S. 1037, 94 S.Ct. 3258, 39 L.Ed.2d lii. Hence the reference in Hancock's moving papers to Rule 914.

The analogous rule which is the stated predicate for Hancock's motion, Rule 11–53, states:

"When a motion is made for the rejection of an executory contract, including an unexpired lease, other than as part of the plan, the court shall set a hearing on notice to the parties to the contract and to such other persons as the court may direct."

What emerges clearly from both the statute and the rule is that their language and their focus is inconsistent with Section 70b's expression of time periods within which a trustee must act. The latter is, as the cases have indeed taught, inconsistent with the former and plainly inapplicable, therefore, in a Chapter XI case. See Section 302, 11 U.S.C. (1976 ed.) § 702; *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, supra ; *In re Miracle Mart, Inc.*, 396 F.2d 62, 64 (2d Cir. 1968).[5]

The difference in treatment was deliberate, in furtherance of what Congress sought to achieve in Chapter XI, for unless a debtor has the leeway needed to appraise its financial situation and the potential value of its assets in terms of the formulation of a plan, the opportunity given by that Chapter would be frustrated. See, *In the Matter of Blazon Flexible Flyer, Inc.*, 407 F.Supp. 861, 864 (N.D.Ohio 1976). Indeed, Section 357(2), 11 U.S.C. (1976 ed.) § 757(2), permitted rejection of an executory contract in

the debtor's plan, the effect of which rejection might not be felt by the debtor and the other party until final confirmation of that plan.

■ But all that has been said is only by the way, for the question remains whether this court may, at the instance of the other party (here Hancock) read into Chapter XI a time limitation within which the debtor must either assume or reject, although neither Section 313(1) nor Rule 11–53 suggests it in so many words.

At the outset, the court observes that resolution of that question in favor of Hancock's position does not mean, nor does Hancock even suggest, that it seeks to disaffirm its existing lease with the debtor for it has long been accepted that the scheme of Chapter XI contemplates that the option to assume or reject rests solely in the debtor.

But this acceptance is not at one with holding that the other party has no rights in the matter. Those rights, drawn from this court's equity powers, *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966), include the relief sought by Hancock, *i. e.*, that the debtor act to affirm or reject within a reasonable time. *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, supra, at 126. Nothing in the Act itself suggests such a plea to the court.[6]

---

5. The 1978 Bankruptcy Code, enacted on November 6, 1978 and operative from October 1, 1979, Section 402(a) of Title IV, only as to petitions filed under that statute continues the distinction between the debtor relief chapters (Chapters 9, 11 and 13) and the liquidation chapter (Chapter 7) from the standpoint of the treatment of rejection of executory contracts and unexpired leases. Section 365(d)(1), applicable in Chapter 7 cases, tracks now repealed Section 70b. Section 365(d)(2), applicable in the cases contemplated by Chapters 9, 11 and 13, fixes no time limitations but allows the court to fix an outside period to

". . . prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status . . . ."

See S.Rep.No.95–989, 95th Cong., 2d Sess. 59 (1978) and House Rep.No.95–595, 95th Cong.,

1st Sess. 348 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5845, 6304.

6. Hancock's reliance on Rule 11–53 set out at p. 4 *supra*, is thus misplaced. That rule implements the bare bones of Section 313(1), *cf. United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 74 S.Ct. 499, 502, 98 L.Ed. 681 (1954), neither of which remotely suggests from their words that they can be the basis for Hancock's motion. The section merely acknowledges the debtor's right to reject; the rule merely provides procedural safeguards. See the Advisory Committee's Note to Rule 11–53 and its reference to *Texas Importing Co. v. Banco Popular*, 360 F.2d 582, 584 (5th Cir. 1966).

As seen in footnote 5, *supra*, Section 365(d)(2) of the 1978 Code codifies the result here reached on this court's application of equitable principles.

■ But to acknowledge some source as the basis for action by the court does not mean that Hancock must now be given what it seeks. Rather, the court must take into account the nature of the interests at stake, the balance of hurt to the litigants, the good to be achieved, the safeguards afforded those litigants, and whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary.

■ The existing lease, with its two 10 year options, has about 45 years to run. It carries a clause permitting the lessee to assign. It thus is a valuable asset to the debtor whether the debtor is able to operate the premises itself as a skating rink or whether such an asset will be at the heart of some third party's interest in funding a plan. The premises are somewhat unique and the debtor expended a substantial sum of money more than 12 years ago at then prevailing prices to make them suitable for the operation of a skating rink. These are the only premises from which the debtor operates its enterprise. Although conjectural at this time, the area in which the skating rink is located seems the focus for future enhancement. And finally, to force the debtor now to take affirmative action, one way or the other, might not only chill the debtor's ability to come to an accord with its creditors who, after all, have been most hurt by this insolvency, but could prove to yield a windfall to Hancock, as lessor, a result incompatible with the thrust of Chapter XI to allow a debtor to utilize that Chapter to rehabilitate and become a profitable venture. *In the Matter of Blazon Flexible Flyer, Inc.*, supra.

■ From Hancock's standpoint, the matter is not so apocalyptic as it suggests. It made its bargain with the debtor as lessee for a stated amount for a stated period. It lay in Hancock's hands to design a lease which might take into account future enhancement of the value of leased premises to be used for a stated purpose in a given area. While it is true there has been some arrearage, Hancock is thereby no different than any other creditor. The fact that the debtor has asked this court to fix use and occupancy does not mean that if the lease is not rejected it will lose its contractual vitality once the debtor can confirm a plan and emerge from this court rehabilitated. To the contrary, use and occupancy relates only to the Chapter XI period during which the lease is neither assumed nor rejected. *Philadelphia Co. v. Dipple*, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); *Palmer v. Palmer*, 104 F.2d 161 (2d Cir. 1939), *cert. den.* 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939). If the debtor decides to assume, during its Chapter XI case, it will be under the obligation to pay the reserved rent from the filing of the petition until assumption and thereafter, and if the use and occupation fixed by this court pending such assumption is less than the rent reserved, the difference must be made up. See *Matter of Chase Commissary Corp.*, 11 F.Supp. 288 (S.D.N.Y.1935); 2 *Collier on Bankruptcy* ¶ 365.03[2] (15th ed. 1979). Moreover, the amount directed by the court to be paid while the issue of fair use and occupation is pending—$24,000 per month—bears a rational relationship to the rent reserved—$28,500 per month—so that Hancock is not, in this court's view, seriously injured, particularly if electricity charges are dramatically overstated. To be sure, Hancock should not be put to the uncertainty of not knowing what the debtor will do until, if rejection occurs in the plan (unlikely in view of the somewhat unique adaptability of the leased premises), it finds itself without an immediate tenant. On the other hand, the debtor should not be expected to jump too soon in this complex matter. See *In re Gulfco Inv. Corp.*, 520 F.2d 741 (10th Cir. 1975).

The expression of policy in the 1978 statute is of some value in assisting this court to find a basis for Hancock's motion under the 1898 Act which carried no such expression in the words Congress wrote for it. See *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957); *In re Texlon Corp.*, 596 F.2d 1092 (2d Cir. 1979); *In the Matter of Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978).

Upon weighing all these relevancies, the court concludes that Hancock's motion should be denied without prejudice to renewal.

It is so ordered.